[66]    DANFORTH, receiver, &c. *vs.* SUYDAM and others.

Lands in Rochester were appropriated in 1836, by the state, for the enlargement of
the Erie Canal, and the owner neglected to claim damages within a year, so that
according to 1 *R. S.* 226, § 48, he would be "*deemed to have surrendered all his
interest in the premises*" to the state. But in 1841, a special act of the legislature
was passed directing the damages to be appraised on the application of the
"owner, his heirs or assigns." In 1842, the damages were appraised accordingly,
and in 1843, with the consent of the original owner, were paid over to the defen-
dants, who had acquired his title *after the expiration of a year from the time of the
appropriation.* In 1841, a creditor, by filing a bill in chancery against the original
owner, after execution at law had been returned unsatisfied acquired a lien upon
*his personal property*, and on that ground claimed to be entitled to the damages in
question. *Held*, that the damages were rightfully received by the defendants, and
that the receiver appointed in the creditor's suit could not sustain a bill filed to
recover the money out of their hands.

It seems the special act of 1841, should be regarded as waiving the surrender of the
owner's title by lapse of time, and restoring his interest, so far at least as to entitle
him to damages on the basis of an imputed ownership of the land. Hence the de-
fendants, who had acquired the owner's interest in *the land*, were entitled to re-
ceive the money, instead of a creditor, who had acquired a lien upon *personal*
estate.

IN the spring of 1836, the canal commissioners appropriated
mill lot E. in the city of Rochester, for the enlargement of the
Erie Canal, pursuant to the act of May 11, 1835, in relation to
the Erie Canal. Joseph Strong was then the owner, but ne-
glected to claim damages within a year after the appropriation
as required by the statute. (1 *R. S.* 226, § 48.) In March,
1837, Strong conveyed to one Chapin, an undivided third of
the lot, subject to the rights which the state had acquired by
such appropriation. He took back a mortgage for the purchase
money, which he afterwards assigned to the defendants. In
June, 1837, Strong executed another mortgage to the defen-
dants upon the same lot, to secure the sum of $24,000. Both
mortgages were foreclosed by the defendants in 1841. The
defendants became the purchasers and obtained the master's
deed.

On the 25th of May, 1841, an act was passed by the legisla-

ture, by which the damages for the appropriation of lands [67] and buildings lying in certain portions of the city of Rochester, including the mill lot in question, were, upon the application of the owners, their heirs or assigns, to be appraised by the canal appraisers, whether the same had been before appraised or not. Under the provisions of this law, Strong presented a claim for damages, for the appropriation of the mill lot, and the appraisers, in May, 1842, awarded to him the sum of $4242,56. Before the award was made, the defendants served a notice upon the canal appraisers, that they claimed the damages by virtue of their title, acquired under the mortgages above mentioned. In May, 1840, and before the award was made, Strong assigned all his *personal* property to one Charles, upon certain trusts for the benefit of his creditors. In March, 1842, Charles sold this claim for damages to one Lyman, and the latter, in April following, assigned it to Isaac M. Hall, who also claimed the damages awarded by the appraisers. Hall and the defendants compromised their conflicting claims; Hall relinquishing his claim to the defendants for a consideration paid by them to him. The defendants, thereupon, with the consent of Strong, early in 1843, received from the canal commissioners the whole amount of damages awarded as before mentioned.

In May, 1841, Messrs. Bangs & Alcott filed a creditor's bill against Joseph Strong, upon a judgment rendered in their favor against him in October, 1838. In 1845, the complainant in this cause was appointed receiver in that suit, and Strong executed the usual assignment to him as such receiver, of all his property, equitable interests and things in action, which he owned at the time of filing the bill. In August, 1845, the receiver filed the bill in this cause in the court of chancery, claiming to recover from the defendants the money which they had received from the canal commissioners, as above mentioned. Whittlesey, vice chancellor of the eighth circuit, before whom the cause was first heard, dismissed the bill with costs, and his decree was affirmed by the supreme court on appeal. The complainant appealed to this court.

[68]    *N. Hill, Jr.* for appellant.

*E. Darwin Smith,* for respondents.

HURLBUT, J. delivered the opinion of the court.

If it be conceded that by the act of appropriation on the part of the state, Strong had become divested of the legal title to "mill lot E.," and that by reason of his neglect to present a claim for compensation within the time required by law, there remained to him no remedy in the courts to recover his damages, nevertheless the state was under a moral obligation to render a just compensation for the land so appropriated to the public use, and the legislature must be deemed to have performed simply an act of justice, and not of favor, in passing the act for the relief of Ely and others, on the 25th of May, 1841. (*Sess. Laws,* 1841, *p.* 203.) This statute provided for an appraisal of damages for the taking and appropriation by the canal commissioners, of certain lands in Rochester, including the mill lot of Strong, "upon the application of the owner or owners, their heirs or assigns," on their relinquishing all claims for damages which might have been awarded on any former appraisal. Under this act the damages which form the subject of this controversy were awarded to Strong as owner, who consented to their receipt by the respondents, as his mortgagees, or as the owners or assigns of the land, and who as between Strong and themselves, were clearly entitled to the fund; and we are now to decide upon their right to retain the money as against the appellant, which must depend upon the construction and effect of the act referred to.

If under the statute, (1 *R. S.* 226, §§ 48, 49,) Strong or his assigns must be deemed to have surrendered to the state their interest in the premises appropriated, it would seem that the statute of 1841, ought to be regarded as having restored that interest, so far at least as to entitle them to an appraisal of damages by reason of an imputed ownership of the land. By this act the state waived all advantage derived to it from the limitation of time, within which the owner was required to pre-

sent a claim for damages, and treated the alleged appro- [69] priation as an entry upon the land, as an inchoate act with a view to an appropriation and appraisal, rather than as an act divesting the owner of his interest in the estate. The statute recognized as owner the person found vested with title at the time of taking the land; and if he had lost title by reason of the appropriation by the canal commissioners, it imputed an equitable ownership to him still, for the purpose of rendering him compensation. It embraced his "heirs" also, and seems to have contemplated that there might be cases where the owner had died after the act of appropriation, leaving an estate in the land capable of descending to his heirs. The statute also named "assigns," as though notwithstanding the acts of the canal commissioners, the owner might have mortgaged or conveyed the land, and thus created an equity in favor of his grantee. The rights and equities of the owner, his heirs and assigns, however imperfect, it was the design of the statute to recognize and protect, to the same extent as if they had been strictly legal and capable of enforcement in the courts; and the fund in controversy, having proceeded from the operation of this act, it may be properly treated as belonging to those who have established a prior equitable lien upon the "owner's" supposed interest in the land, although we may not be able nicely to define the nature of the estate which he had in it.

It was contended for the appellants that the term "owner" referred to him only who was such at the time of the appropriation, and that the term "assigns" applied to those only who purchased afterwards, and before the title vested in the state, i. e. within a year after the lands were taken. If the word "owner" was employed in the statute in the strictest legal sense, this might be so, provided the original owner ceased to be such to all intents, after a year's neglect to make his claim for damages. But so strict a construction of the language of this act cannot obtain without defeating its manifest intent. There can be no doubt that if the persons from whom the lands were taken were living and had not conveyed, that it was the intention of the legislature to pay them upon an appraisal of [70]

their damages; and yet, according to the argument, they had all ceased to be owners for the purpose of a conveyance at the expiration of a year after the appropriation; and if so, I see not why they had not ceased to be such for any purpose. The term " owner" in this statute ought rather, I think, to be regarded as descriptive of the person who was equitably entitled to receive compensation for damages, rather than as a term designating the person having a legal estate in the land.

As to the term " assigns," if that is to have so limited an application as the one contended for, then the word " heirs" must also be confined to those whose ancestor had died within a year after the appropriation; which might give the statute a limited and partial application, contrary to equity, and which its language does not require. It is better to consider the language of the act as employed in an enlarged and general rather than in so technical a sense, and to construe it in a spirit as liberal as its design was just and equitable.

At the time of the passage of this act, the respondents had become the purchasers of the mill lot in question under the foreclosure of two mortgages, one executed directly to them by Strong, and the other assigned by him to them; and, if they may not be regarded as owners of the land, they must at least be deemed the assigns of Strong, the owner, within the meaning of the statute. Their interest as such assigns accrued prior to the lien created in favor of the appellant by the filing of the creditor's bill, which resulted in his being appointed receiver; and therefore the respondents must be adjudged to have a prior and superior equity, and to be entitled to retain the fund in controversy. The decree of the supreme court must be affirmed.

Decree affirmed.